# Williamson's Estate.

## Appeal of the Pennsylvania Company for Insurances on Lives & Granting Annuities, Trustee.

*Taxation—Assessments—Penalty for failure to make return—Act, 1885.*

Under the act of June 30, 1885, P. L. 193, a person has the right to decline to make a return of personal property for the purposes of taxation; the act fixes with exactness the consequence of such refusal; the assessor must supply the want of the return with his estimate; to this fifty per cent must be added, and this sum stands in lieu of the return as the basis for taxation.

*Board of Revision of Taxes of Phila.—Powers—Assessments.*

The Board of Revision of Taxes of Philadelphia has power to make a valuation of property for the purposes of taxation only where the assessors have omitted to make it.

In the year 1888, Williamson failed to make any return of his personal estate to the assessors for taxation. During the same year the assessors estimated his taxable personal estate at $45,000 and assessed him with that amount. The Board of Revision of Taxes, when they came to revise the assessment, added fifty per cent by way of penalty, and left the assessment as corrected and revised by them to stand at $67,500. The taxes as thus computed were placed in the hands of the receiver for collection. Two or three months after this was done, and in the following year, Williamson died. The inventory of his estate showed personal property amounting to $2,500,000. In April, 1889, six months after decedent should have made his return, the Board of Revision made an assessment, without the intervention of the assessors, fixing the amount of the personal estate at $2,500,000, and adding a penalty of fifty per cent. *Held*, that the second assessment was improper and void, and that the city having received the whole amount of the tax under the first assessment could recover nothing more from the estate.

*Collateral inheritance tax—Income first year after death of decedent.*

The income derived from the estate of a decedent during the first year after his death, is not subject to the collateral inheritance tax, although by direction of decedent's will added to the principal, and both principal and income applied indiscriminately to the payment of expenses, etc.

*Collateral inheritance tax—Conversion of land outside of state.*

The real estate of testator lying in other states, which he has directed his executors to sell, and the proceeds from which he has given to persons and objects in this state, are converted by the direction to sell, and are subject to the collateral inheritance tax. Miller v. Commonwealth, 111 Pa. 321, applied.

MR. JUSTICE MITCHELL dissented from this last proposition.

Argued Jan. 6, 1893. Appeal, No. 399, Jan. T., 1892, by the Pennsylvania Company for Insurances on Lives and Granting Annuities, trustee under the will of Elizabeth V. Williamson, deceased, from decree of O. C. Philadelphia Co., Jan. T., 1890, No. 484, dismissing exceptions to adjudication. Before PAXSON, C. J., STERRETT, GREEN, WILLIAMS, McCOLLUM, MITCHELL and DEAN, JJ.

Audit of account of Daniel B. Cummins, executor of Isaiah V. Williamson, deceased.

At the audit, before ASHMAN, J., the city of Philadelphia claimed to recover $11,812.65, being the amount of tax on new assessment by the board of revision of taxes on testator's personal estate for the year 1889, as stated in the opinion of the Supreme Court. The state of Pennsylvania claimed the collateral inheritance tax on real estate principally in the city of St. Louis, but all outside of the state of Pennsylvania, which was sold by the executor under a direction in the will, and the proceeds thereof brought into this state for distribution. The state also claimed its collateral tax on the income of the estate for the first year after decedent's death. The auditing judge allowed all of the claims, except the last.

The facts appear by the opinion of the Supreme Court.

Exception to the adjudication, filed by the commonwealth, to the refusal of tax on income was sustained; exceptions by appellant to allowance of tax on proceeds of realty and under new assessment were dismissed in an opinion by FERGUSON, J., ASHMAN, J., dissenting, 1 Dist. R. 159.

The material portions of the will were as follows:

" Item 13. I will and direct that the sum of three hundred thousand dollars shall be paid by my executors to The Pennsylvania Company for Insurances on Lives and Granting Annuities of the city of Philadelphia as a trustee and in special trust as follows, that after paying all proper legal charges and expenses, said trustee shall pay the net income of said fund on the first day of November in each year to the following named charitable institutions and associations of the city of Philadelphia, which income they shall expend for the charitable uses and purposes for which such institutions or associations were established; it being understood that my executors in their

discretion may pay to said trustee said'three hundred thousand dollars in money or good interest bearing securities, or productive real estate at a fair valuation to be affixed by the executors, or in good dividend paying stocks considered safe by them, as is further provided in items sixteen and seventeen, to the provisions of which this fund is made subject. . . .

"Item 14. The rest, residue and remainder of my estate, real, personal and mixed, wherever situated, vested, contingent or future, after satisfying the foregoing bequests, as such remainder shall be realized and converted into proper securities by my executors as provided in item seventeenth of this will, shall be by them transferred and delivered to The Pennsylvania Company for Insurances on Lives and Granting Annuities, of this city, which company shall hold the same as a trustee and in special trust . . . . [for private beneficiaries.]

"Item 17. . . . And the executors shall make up the trust fund provided for by item thirteenth for the benefit of the charities therein named, by handing over to said trustee such securities and investments as they shall think best, or they may convey to the trustee in fee simple any of my improved real estate, wherever situated, to be held in trust for the uses and purposes in said thirteenth item specified, at prices which shall be fairly affixed and determined by the executors. And the rest, residue and remainder of my estate consisting of bank and other stocks, loans, lands and tenements, ground rents and all real, personal and mixed property of every description, and wherever situated in this state and elsewhere, and by whatever title held, whether vested, contingent, present, or future, which may belong to me at the time of my decease, I direct my executors to sell and convert into money (excepting only such personal investments which they may deem suitable to enter into the trust provided for in item fourteenth) and then reinvest the same in such bonds, loans or other investments, (excepting capital stocks of corporations or other companies only) as the executors may deem best for the benefit and advantage of the residuary trust provided for in the fourteenth item of this will, and as such residuary portions of my estate shall be so converted and reinvested by the executors, they will from time to time hand over to the said trustee, to be by it held and disposed of as in the fourteenth item provided. . . .

And the net proceeds of all such sales as well as all rents and income derived from any part of said property shall constitute a part of my residuary estate, and be invested as hereinbefore expressed. . . . And I direct that my executors shall apply the proceeds of sales of real estate equally, and in like manner with the proceeds of sales of personal estate, in payment of all or any of the bequests and legacies given by me. . . ."

The opinion of the auditing judge was in part as follows, by Ashman, J.:

"The commonwealth claimed collateral inheritance tax (1) upon the sum of $457,456.73, being the income which accrued to the estate during the first year succeeding the death; and (2) upon $165,954.77, which represented the proceeds of sale of certain land outside of the state, the land itself having been sold by the executor. The claim upon the former sum was founded upon the decision of the Supreme Court rendered in this estate, and reported in 28 W. N. C. 353, whereby this income was held to be part of the principal. But it was principal only because the testator had made it such, and was no more a part of his estate at his death than is the income for the first year of any estate, bequeathed, for instance, in pecuniary legacies not bearing interest until after the end of the year, which is, nevertheless, always treated as principal. It is safe to say that the tax has never hitherto been successfully demanded upon income in such a case. The act of 1887 imposes the tax upon estates 'passing from any person who may die seized or possessed thereof,' and it cannot apply to accretions created after the death of that person, of which he could by no possibility therefore have been seized or possessed.

"The point involved in the second branch of the claim turns upon the question of conversion. By the 13th item of the will the executors are authorized to make up the bequest of $300,000 therein given, out of money or securities or real estate at a valuation to be fixed by them. By item 17 the executors are directed 'to sell and convert into money,' the residue of the estate, 'consisting of bank and other stocks, loans, lands and tenements, ground rents and all real; personal and mixed property of every description.' The authority to use the realty in part payment of the legacy of $300,000 can be held to have worked a conversion only on the theory that the

setting apart of the real estate at a price was in effect a sale by the executors, inasmuch as it brought about precisely the same result as would have been accomplished by a sale. On this theory the beneficiary would take as a purchaser and not as a devisee : Miller v. Commonwealth, 111 Pa. 321. To this it may be replied that the discretion lodged with the executor was fatal to the idea of a conversion by the testator, and that the case is distinguishable from cases like Jones v. Caldwell, 97 Pa. 42; Laird's Appeal, 85 Pa. 339, and Pyle's Appeal, 102 Pa. 317, where there was a positive direction to sell, with an option on the part of the beneficiary to accept either land at a valuation, or its proceeds, in settlement of his legacy. The testator has fixed, in these instances, the status of his real estate, and neither the executor nor the beneficiary could alter it. But, after all, had the executor under the present will any voice in determining the shape in which the gift should go to the donees, and was not his discretion in the matter apparent rather than actual ? Was he not forced to deal with all the real estate as personalty ? If he chose to apportion some of it as a part payment of the legacy, he made it personalty, and as to the remainder of the real estate it was already personalty by virtue of the direction to sell the residuary estate. If he paid the legacy entirely in cash, then all the real estate was necessarily converted, because it was all included in the residue. Apparently he could not escape from the purpose of the testator to treat the whole property as personalty. It was hardly possible to express that purpose more plainly. The only gift about which there could be a doubt was that in the 13th item. But it was a gift of 'the sum of $300,000, to be paid,' etc. In the whole item there was not a word tending to show a devise, but everything descriptive of a legacy; the 'income,' not the 'rents,' was to be expended by the trustee. However this may be, it is at least beyond dispute that the residuary estate, of whatever it might consist, was to be sold; and it was a matter of evidence that the real estate in question formed part of that residue, and was actually sold by the executor. The proceeds of the sale are in his hands and in this jurisdiction. The auditing judge does not see any special difficulty in the inquiry as to their liability to the collateral inheritance tax. The land from whose sale they are derived confessedly

was beyond the reach of the tax laws of Pennsylvania, and if the testator had devised the land he would have put his gift outside of the operation of those laws. Of course the law of the situs would have superseded the law of the domicile. But he did not devise the land; on the contrary, he made the proceeds of its sale as much a part of his estate in Pennsylvania as the bonds and stocks which he left in his fire-proof. It is hard to see how the imposing of a tax by this commonwealth upon these proceeds interferes with the sovereign right of the state of Kentucky over the real estate within her borders. The question was decided in Miller v. The Commonwealth, 111 Pa. 321, and that case was certainly not touched by Bittinger's Estate, 129 Pa. 338 ; the former being, like the present, a gift of the proceeds of sale of foreign real estate, and the latter being a devise of the real estate itself."

The opinion of the court below was in part as follows, by FERGUSON, J.:

"In this estate the Supreme Court have recently decided that, as the income of the testator's estate for the first year after his death, amounting to $457,456.73, was, by the direction of his will, added to the principal, and both principal and income applied indiscriminately and without distinction to the payment of expenses, debts and legacies, etc., there was no illegal accumulation of the income which was in violation of the act of April 18, 1853: Williamson's Est., 28 W. N. 353 ; 143 Pa. 150.

" This question is now settled, but the fact remains that the result of this decision is that the corpus of the testator's estate has been preserved to the extent of $457,456.73, upon which sum no collateral inheritance tax has been paid to the commonwealth, and its payment is now demanded.

" This is resisted upon the ground that the act of May 6, 1887, with reference to collateral inheritance tax, only imposes this tax upon ' estates passing from any person who may die seized or possessed of such estates,' and that, as the testator did not die seized or possessed of the income of his estate, which accrued the first year after his death, there is no liability for the tax. There would seem to be considerable force in this proposition ; but when you come to make a practical application of it to this particular case the force disappears.

" The method of assessing the collateral inheritance tax is to

take the inventory and appraisement of the decedent's estate as filed within thirty days after his death, or a new appraisement, as made by the state appraiser, and, after deducting therefrom the debts and liabilities of the decedent, and the expenses of settling his estate, to impose the tax upon the balance remaining. This is what was done in this case, and the tax was paid on the balance so ascertained. But the Supreme Court having held that, as this testator directed the income of his estate for the first year should be applied to the payment of expenses, debts and legacies, and all of it, and a very considerable sum more, was so applied, there was no accumulation. Then, as the amount of the expenses, debts, etc., were deducted from the amount of the principal of the estate as it existed at the time of the death of the testator, when the appraisement for the collateral inheritance tax was made, and those expenses, debts, etc., to the amount of $457,456.73, were paid out of the income, it necessarily follows that there is that much more principal left to *pass* from the testator to his collateral heirs, and, therefore, that much more that is liable to the tax.

" In view of the decision of the Supreme Court, we do not see any escape from this conclusion—either the debts and expenses must have been paid out of this income, or there was an accumulation in violation of the statute ; and, if they were so paid, then the principal to that extent was left intact, to pass beneficially to the collateral heirs of the testator, and is, therefore, subject to taxation.

" If it is claimed that the income for the first year was appropriated to pay legacies only, the claim of the commonwealth is much strengthened, because legacies payable out of income are annuities (Schofield v. Redfern, 32 L. J. Ch. 627), and annuities are clearly subject to the collateral inheritance tax : Act of May 6th, 1887.

" The exceptions of the commonwealth to the rejection of this claim are therefore sustained."

The dissenting opinion in the court below was as follows, by ASHMAN, J.:

" Upon the single point in which the foregoing opinion differs from the ruling of the auditing judge, I must beg leave to dissent. The point is professedly based on the decision of the Supreme Court when the account of the executors was before

it. But that decision merely declared that that took place in this estate which really happens to the estate of every decedent, to wit, that the income of personalty for the first year is in effect part of the capital. Until the expiration of the year no legacies are payable, and up to that time the revenue of the estate is as liable as the estate itself to creditors. The debt of the estate to the commonwealth is payable out of this mingled fund, but it is ascertained at the moment of death by deducting from the capital of the estate the amount of its indebtedness, and computing the tax upon the balance. The majority opinion gives to the commonwealth not only the tax upon the estate, which the statute imposes, but a tax in addition upon the indebtedness of the estate, which the legislature never dreamed of imposing. The court, in a word, decides that, in proportion as a decedent is indebted, the tax upon his property shall be increased. The effect may be salutary in repressing habits of extravagance in those who are to be the decedents of the future, but it may be safely affirmed that this purpose was not in the minds of the framers of the act of 1887. Their intention was to impose a tax upon the estate as it was when it left the hands of the decedent. The argument of the opinion is, that in appraising the estate for taxation, the indebtedness was deducted ; that the debts, however, were paid out of the first year's income ; and that the estate was therefore richer by $450,000 for the purposes of the commonwealth than the appraisers had estimated it to be. But the debts had to be paid before the commonwealth could tax, and it made no difference to the commonwealth by whom they were paid. Nor could it make any more difference to the distributees ; the debts were payable out of principal and out of income accruing from principal during the first year, and if the income paid them, the principal remained unbroken. What therefore the distributees lost on the one hand was made up to them on the other."

*Errors assigned* were disposal of exceptions, as above, quoting them.

*John G. Johnson,* for appellant.—The method of assessment of taxation upon personalty prescribed by the act of June 30, 1885, is exclusive of all prior ones, and repealed the provisions of prior acts prescribing different methods.

The method of assessment prescribed by the act of 1885 did not warrant what was done by the board of revision in the present case.

The state by the method of assessment provided by the act is better protected than it was by the earlier system. . If it be not, the remedy lies with the legislature and not with this court.

The difference between our case and Miller v. Com., 111 Pa. 321, and other cases, is that before any power of sale is conferred upon the executor, he is authorized to appropriate to a legacy improved real estate to the extent of $300,000.

*S. Davis Page*, with him *E. P. Allinson, Boies Penrose, Howard W. Page* and *W. U. Hensel*, attorney-general, for the commonwealth, cited Miller v. Com., 111 Pa. 321; Orcutt's Ap., 97 Pa. 185; Bittinger's Est., 129 Pa. 338; Pyle's Ap., 102 Pa. 317; Laird's Ap., 85 Pa. 339; Jones v. Caldwell, 97 Pa. 42; act of May 6, 1887, P. L. 79.

*E. Spencer Miller*, assistant city solicitor, *Charles F. Warwick*, city solicitor, for the city, cited the acts of May 27, 1841, P. L. 393; July 27, 1842, P. L. 441; March 14, 1865, P. L. 320; Feb. 2, 1867, P. L. 137, as still in force; also Moore v. Taylor, 147 Pa. 481.

OPINION BY MR. JUSTICE WILLIAMS, March 30, 1893:

Three agencies may be employed in assessment of property for taxation. These are the assessors, the board of revision, and the court of common pleas. The assessors seek out the taxable property in their respective districts, ascertain the names and residence of the owners, and estimate its actual cash value. The results of their work are arranged in a schedule, or tabulated summary for each ward in the city, which is familiarly known as " the assessment." This assessment is returned by the assessors who make it to the board of revision. This board examines the work of the assessors, revises and equalizes it, corrects any mistakes that appear in it, and prepares it for examination by the taxables. A day for examination by them is then fixed and notice is given to them that they may appeal from the assessment, as revised, to the board of revision, upon any subject connected with the assessment on which they may desire to be heard. After these applications or ap-

peals by taxables have been heard and such further corrections made by the board of revision as are thus brought to its attention, the assessment is completed, subject to the right of any dissatisfied taxable to appeal to the court of common pleas. The rate of taxation is now applied to the valuation and the amount chargeable to each taxpayer is ascertained. A list showing these amounts is prepared for the use of the collector which is commonly called "the duplicate." In this city the list is prepared in triplicate, the third copy being furnished to the city controller, to whom the receiver of taxes is required to report his collections daily. The law provides that the duplicate or list of taxes for any given year shall be placed in the hands of the receiver as early in the year as practicable. To enable them to do this the board of revision hears the appeals of the taxables and completes the assessment in the fall preceding the year for which the taxes are assessed and collected. This is a general glance at the system provided by law for the assessment and collection of taxes in Philadelphia, but this case requires us to consider more particularly the position and powers of the board of revision. By a succession of statutes this board is authorized to divide the city into assessment districts, appoint the assessors for each, and require them, by a written order or precept addressed to them, to enter upon their work and make returns of it when completed. The board is entitled to exclusive custody and control of the assessments when made and of all books and papers relating thereto. Their power over the assessments is defined by the act of 1865. They may "revise and equalize" the valuations made by the assessors, and to this end may "raise or lower the valuation either in individual cases or by wards." They may also rectify mistakes by making "valuations where they have been omitted." They have no original power to make an assessment, but may supply an omission in the work of the assessors. The assessment is therefore primarily the work of the assessors, and the powers of the board of revision extend only, according to the letter and the spirit of the act of 1865, to the work of revision. The objects of revision are two : The equalization of values and consequently of the burden of taxation, and the correction of errors whether of omission or commission. Thus if the assessor has neglected to put a valuation upon any of the property he has

listed, the board may supply the omission. If he has wholly overlooked property that should have been listed the board may place it on the list and fix its value. The revision of the assessment being completed the next duty of the board is the computation of the taxes and the issuing of the duplicate to the receiver. But in point of fact the board continues, even after the duplicate is issued, to correct mistakes when discovered; and there seems to be no reason why they should not do so, upon application by, or notice to, the person to be affected by such correction, down to the time of actual payment of the taxes.

In the case in hand the assessor served a notice upon Mr. Williamson, requiring him to make return under oath of his personal estate subject to taxation. He disregarded the notice and made no return. The assessor then did just what the act of June 30, 1885, required him to do. He estimated the taxable personal estate of Mr. Williamson at $45,000, and assessed him with that amount. The board of revision, when they came to revise the assessment, added fifty per cent by way of penalty, in accordance with the direction of the act of 1885, and left the assessment as corrected and revised by them to stand at $67,500. The taxes were computed on this basis and placed in the hands of the receiver for collection. Two or three months after all this was done Mr. Williamson died. His executors filed an inventory of the personal estate that came into their hands, amounting to about two and a half millions. On the 12th day of April, 1888, the board of revision made an assessment, without the intervention of the assessor, fixing the amount of the personal estate of Williamson at the time when he should have made his return in the fall of 1887 at the sum shown to be in the hands of his executors six months later. To this they added fifty per cent by way of penalty, making the new assessment stand, after its revision, at about four millions of dollars. Upon this they have computed the taxes, and ask that the executors, who have already paid the sum originally demanded by the receiver, shall pay the balance now claimed to be due. Our question is, can this new assessment stand?

The statutes conferring and defining the powers to be exercised by the board give the power to make a valuation only where the assessors have omitted to make it. But the assessors

did not omit to assess Mr. Williamson. Failing to secure a return of his property under the act of 1885, the assessor had a plain statutory duty before him and he discharged it. He estimated, as well as his investigations enabled him to do, the personal estate of Mr. Williamson, and returned his assessment to the board of revision. They might have called the attention of the assessor to his estimate, asked him to renew and extend his investigations and make another estimate, but they did not. On the other hand they adopted the estimate as returned and proceeded to discharge the duty the law put on them by adding fifty per cent thereto by way of penalty. The assessment was then completed. It only remained to compute the taxes, and they did this, and turned the duplicate over to the collecting officer.

But it is urged that the new assessment is valid as the correction of a mistake. If so, who made the mistake? It does not appear that the assessor did, but it is to be presumed that in view of the data within his reach he estimated the property of Mr. Williamson intelligently. It does not appear that the board made a mistake, for, believing as they must have done that the estimate of the assessor was correct, they added the penalty and finished the work of revision. The trouble was that neither the assessor nor the board had the means of knowing what Williamson's personal estate was, and unless the fact that they were ignorant as to the extent of his property can be held to be a mistake in judgment as to its value, the new assessment cannot be sustained on this theory. They were not misled by Williamson. If he had made a false return and so misled the board, a very different question would be raised. He simply declined to give any information. He said, in effect, make your examination and estimate and I will abide by it. The assessors accordingly made a regular estimate upon their own knowledge. The board of revision were content to increase it by the addition of the penalty. Months afterward and when Williamson was in the grave, the board examine the inventory filed by his executors and conclude that the assessor should have made a more extensive examination and discovered in some way, what he was at the time unable to discover, the extent of taxable personal estate held by Mr. Williamson; and they accordingly proceed to punish his estate for the want of

thoroughness of the assessor. Williamson had a right under the act of 1885 to decline to make the return called for. That act fixed with exactness the consequences of such refusal. The assessor must supply the want of the return with his estimate. The board of revision must add fifty per cent to the estimate and this sum is to stand in lieu of the return as a basis for taxation. The board of revision has undertaken to add a penalty not to be found in the statute. If the taxable happens to die after the computation of his taxes and before their actual payment, they propose to go to the dead man's strong box, count up, or have his executors do so, his securities, add fifty per cent to their par value to punish the decedent for the assessor's failure to discharge his duty, and assess a tax upon that basis. This is not nominated in the statutory bond.

But it is urged that the city should have been able to reach the vast estate disclosed by this inventory, and that this is now the only way in which it can be done. This may be so. But at the proper time the taxing officers might, by the exercise of vigilance in the discharge of their duties, have obtained the information necessary to enable them to approximate the true amount of taxable property held by Williamson. The fault is not his, but theirs. He had a right to refuse to make the return. They had the right to make an assessment to take the place of it. They made it without waiting to secure sufficient knowledge to enable them to make it intelligently. If it be suggested that the city ought not to suffer for the neglect of its officers we assent to the correctness of the general rule, but in this case we are considering a proceeding that is regulated by a statute, and the question is what does it authorize?

It may be said that the effect of such a holding will be to encourage other persons to decline to make the returns contemplated by the act of 1885. It is enough to say, in answer, that we do not make the law and that the right to refuse the return is given by the act of 1885 and not by us. So the penalty for exercising this right is fixed by the act, and is not under the control of the board of revision.

It follows from what has been said that the ruling of the court below in regard to the city taxes resting on the second and unauthorized assessment was error. The assessment made at the proper time and in the proper manner, having been revised

and corrected by the board, and used as the basis for the computation of taxes ; and the taxes so computed having passed into the hands of the collecting officer two months or more before the death of Williamson, the time for opening the assessment or changing the valuation of the personal securities of the taxable was closed by his death.   He could not be served with notice.   He could not exercise the right which the law gave him of repenting after the valuation was completed, and making a full return in answer to the original notice.   He could not appeal.

The orphans' court was also in error in holding that our decision In re Williamson's Estate, 143 Pa. 150, subjects the income for the first year to the collateral inheritance tax.   This tax fastens upon so much of the estate as passes to collaterals as it stands at the death of the testator.   It comes out of the corpus of the gift upon its descent or transmission, upon the death of the former owner to the beneficiary.   Income accruing subsequently comes not from the testator or intestate but from the property held by or for the use of the legatee or other beneficiary, and is not to be distinguished from income derived by the same persons from any other source.

Upon the remaining question we agree with the court below.   The lands of the testator lying in other states which he directed his executors to sell, and the proceeds from which he gave to persons and objects in this state, are converted by the direction to sell.   The fund being distributable here is subject to the collateral inheritance tax under the rule stated in Miller v. The Commonwealth, 111 Pa. 321.

The decree of the court below is reversed as to the allowance of the city taxes and the collateral inheritance tax on the income for the first year.

It is affirmed as to the residue.

Mr. Justice Mitchell :

I am unable to concur in that part of this judgment which holds that the real estate in other states was subject to collateral inheritance tax.   I cannot see that a technical conversion gave this state any jurisdiction for taxing purposes, under a statute not taxing the legatee personally but the property passing from the testator.