# Elliot, Appellant, v. Philadelphia.

*Municipal corporations—Cities of first class—Increase of indebtedness
—Taxable property—Last assessed valuation—Acts of April 20, 1874,
P. L. 65, and May 13, 1856, P. L. 567—Constitution, art. IX, sec. 8—
Taxes—Personal securities.*

1. The last preceding assessed valuation of taxable property to be
taken under the Act of April 20, 1874, P. L. 65, as the basis for com-
puting the two per centum borrowing limit of the city of Philadelphia
for the year 1910, under art. IX, sec. 8, of the constitution providing

that "The debt of any county, city, borough, township, school district or other municipality, or incorporated district, except as herein provided, shall never exceed seven per centum upon the assessed value of the taxable property therein, nor shall any such municipality or district incur any new debt, or increase its indebtedness to an amount exceeding two per centum upon such assessed valuation of property, without the assent of the electors thereof at a public election in such manner as shall be provided by law," is the assessment made by the assessors in 1909, as revised by the board of revision and certified to the receiver of taxes on or before February 1, 1910, in accordance with the provisions of the Act of May 13, 1856, P. L. 567. The practice giving the board of revision equitable supervision over the assessments after the duplicates are in the hands of the receiver of taxes for collection is of doubtful authority and should not be encouraged.

2. The law requires all the preliminary steps in the valuation of property to be taken so that the assessment shall be completed when the duplicates are certified to the receiver of taxes on or before February 1, and all of these things are presumed to have been done, and in contemplation of law have been done when the board of revision certifies the duplicates to the receiver of taxes for collection.

3. The character of a tax is determined by the act which authorizes its imposition, and not by the use made of the revenue thus derived.

4. The tax laid on personal securities as "money at interest" by the act of 1879 and its supplements, is a state tax, although the commonwealth returns a large part of it to the counties, and the personal securities upon which the tax is levied cannot be considered as property taxable for purposes of a city or county within the meaning of the constitution.

*Municipalities—Cities of first class—Appropriation for schools—Estimates—City controller—Act of April 22, 1905, P. L. 267.*

5. Under the Act of April 22, 1905, P. L. 267, requiring the councils of a city of the first class to annually appropriate for school purposes a sum not less than five mills "on each dollar of the total assessment of real property of the school district," an appropriation made upon estimates furnished by the controller acting on requisitions by the board of education is the nearest approach possible to the exact amount which upon a completed valuation may be shown to be required with the information at hand when the appropriation is made and it is the method recognized by law for the purpose stated. If the board of education accepts the amount appropriated, maintains the school system out of this appropriation and settles its accounts with the city for the school year upon this basis, it has no further claim for an alleged deficiency.

*Cities—Net indebtedness—Deductions—Solvent debts—Act of April 20, 1874, P. L. 65.*

6. The Act of April 20, 1874, P. L. 65, providing for the ascertaining of the net indebtedness of a city by deducting from the gross indebtedness "the moneys in the treasury, all outstanding solvent debts and all revenues applicable within one year to the payment of the debt," is constitutional.

7. Municipal authorities cannot arbitrarily say that every claim of the city is an outstanding solvent debt, or that revenue necessary to pay current expenses can be set apart for the liquidation of outstanding obligations, but where there are bona fide outstanding debts due the city and revenues not necessary to meet current expenses are available for the payment of indebtedness within the year, such assets can be used for deductions under the provisions of the act of 1874, in ascertaining the net indebtedness.

8. The statutes relating to municipal loans do not provide that there shall be a definite statement of purpose in an ordinance for a loan for temporary or other purposes such as is required to give notice to the public by the act authorizing a loan only upon direct vote of the people. The practice, however, is, as it ought to be, to set out in the ordinance the purpose or purposes for which the indebtedness is to be incurred, even when the loan is for temporary purposes and authorized by ordinance without a vote of the people.

Argued May 19, 1910. No. 357, Miscellaneous Docket No. 2, 1910. Original Bill in Equity by Frank S. Elliot, a citizen and taxpayer of the city of Philadelphia, in his own behalf and in behalf of such other citizens and taxpayers as may join, v. City of Philadelphia and John E. Reyburn, Mayor, John M. Walton, Controller, and Murrell Dobbins, Treasurer. Before FELL, C. J., BROWN, MESTREZAT, POTTER, ELKIN and MOSCHZISKER, JJ. Bill dismissed.

Taxpayers' bill in equity to restrain the issuance of a loan.

The facts appear in the opinion of the Supreme Court.

*Hampton L. Carson* and *Thos. Raeburn White,* with them *Robert D. Jenks,* and *John Kent Kane,* for plaintiff and for Logan M. Bullitt et al., intervening plaintiff.— The debt capacity of the city should be based on the

assessed valuation of taxable property for city purposes only: Bruce v. Pittsburg, 166 Pa. 152.

The debt capacity is to be computed upon the last completed assessed valuation: C., B. & Q. R. R. Co. v. Village of Wilber, 63 Neb. 624 (88 N. W. Repr. 660); Levy v. McClellan, 196 N. Y. 178; Rathbone v. Kiowa County Commissioners, 83 Fed. Repr. 125; Board of Education v. National Life Ins. Co., 94 Fed. Repr. 324; State v. Babcock, 24 Neb. 640 (39 N. W. Repr. 783); Fuller v. Heath, 89 Ill. 296; Kingsbury v. Pettis County, 48 Mo. 207; Hopper v. Inhabitants of Union Twp., 54 N. J. Law, 243 (24 Atl. Repr. 387); Wilson v. Board of Education, 12 So. Dak. 535 (81 N. W. Repr. 952); Prickett v. Marceline, 65 Fed. Repr. 469; State v. Tolly, 37 S. C. 551 (16 S. E. Repr. 195); Germania Savings Bank v. Darlington, 50 S. C. 337 (27 S. E. Repr. 846).

Loans authorized but unissued are to be considered in computing the borrowing capacity of the city.

The city is under a present legal obligation to appropriate money for school purposes which obligation constitutes a part of the city's debt: Wells v. Smyth, 55 Pa. 159; Bruce v. Pittsburg, 166 Pa. 152; Dixon County v. Field, 111 U. S. 83 (4 Sup. Ct. Repr. 315).

Unliquidated claims for property taken or injured by the city, under its power of eminent domain, is a part of its unfunded debt: Keller v. Scranton, 200 Pa. 130; Levy v. McClellan, 196 N. Y. 178.

Defendants are not entitled to deduct from the face of the indebtedness payments not yet made to the sinking fund, outstanding claims for taxes, water rents or miscellaneous claims standing on the books of the city: Brooke v. Phila., 162 Pa. 123.

The specific purposes of the loan are not distinctly set out in the ordinance as the law requires: Sank v. Phila., 8 Phila. 117.

*J. Howard Gendell*, city solicitor, and *John G. Johnson*, for defendant.—Nothing is due the board of education.

As to purchases made without authority, it seems almost needless to say that these are not binding upon the city, and therefore cannot be considered debts to be deducted from the city's borrowing capacity: Smart v. Phila., 205 Pa. 329; McManus v. Phila., 201 Pa. 619; Hepburn v. Phila., 149 Pa. 335, and many other cases.

As a pure matter of law, it is settled that the mere authority to incur a debt is not in itself the incurring of a debt. Authority to do an act is clearly not the doing of the act authorized: Redding v. Esplen Boro., 207 Pa. 248.

The city is entitled to certain credits which are not allowed in the bill: State v. Hopkins, 14 Wash. 59 (44 Pac. Repr. 134).

The purposes for which the new loan is to be applied are sufficiently set forth: Barr v. Phila., 191 Pa. 438.

The tax on "money at interest" is, in Philadelphia, a county tax partly to provide money to reimburse the county for a debt it must pay the state, but largely to give the county an additional income: Com. v. Phila. Co., 10 Atl. Repr. 772; County of Schuylkill v. Com., 36 Pa. 524; Com. v. Moore and the City of Phila., 7 Dauphin, 103; Com. v. Phila. County, 157 Pa. 531.


OPINION BY MR. JUSTICE ELKIN, July 1, 1910:

The plaintiff, a resident taxpayer of the city of Philadelphia, seeks to enjoin the municipal authorities from making a loan authorized by ordinance for certain city purposes. The objections relate primarily to constitutional questions and for the purpose of this case may be discussed in a few general propositions. It is contended that the city has exhausted its borrowing capacity and by reason thereof cannot increase its indebtedness to the amount authorized by the proposed new loan. If in point of fact the city has already incurred an indebtedness sufficient to exhaust its borrowing capacity under the constitution the proposed additional loan would be without warrant of law and the authorities should be enjoined. In the determination of the fact, several ques-

tions of law are necessarily involved. The first important question to be considered is what assessment shall be taken as the basis of valuation in making the computation. Article IX, sec. 8, of the constitution provides: "The debt of any county, city, borough, township, school district or other municipality, or incorporated district, except as herein provided, shall never exceed seven per centum upon the assessed value of the taxable property therein, nor shall any such municipality or district incur any new debt, or increase its indebtedness to an amount exceeding two per centum upon such assessed valuation of property, without the assent of the electors thereof at a public election in such manner as shall be provided by law." .The Act of April 20, 1874, P. L. 65, was passed for the purpose of giving force and effect to this provision of the constitution. It provides in substance that the corporate authorities may by a vote duly recorded upon the minutes authorize and direct the increase of indebtedness to an amount in the aggregate not exceeding two per centum upon the assessed value of the taxable property therein "as fixed and determined by the last preceding assessed valuation thereof." In the present proceeding what constitutes "the last preceding assessed valuation" is a controverted question. It is contended for the plaintiff that the assessment made in 1908, as finally adjusted in 1909, is the valuation to be taken as the basis for computing the two per centum, while for the defendants it is argued that the assessment made by the assessors in 1909, as revised by the board of revision and certified to the receiver of taxes on or before February 1, 1910, is the "last preceding assessed valuation" upon which to compute the limit of indebtedness. We have concluded that the contention of the city in this respect must be sustained. A brief discussion of the requirements of the law and the manner of making assessments and revising valuations will be helpful to a proper understanding of .the question involved. All assessments are made by the local assessors in the first instance.

This is the first step taken in fixing the valuation for the purpose of taxation. It is the foundation upon which all valuations depend. It is even more than a foundation because if the assessment as returned by the assessors be not modified or corrected as provided by law it becomes the assessed valuation upon which the tax rate is levied. The board of revision exercises certain supervisory powers of statutory origin. These powers, however, are no greater than the legislature gave. The duties of assessors and of the board of revision are all prescribed by statute, and when these duties have been performed at the time or times and in the manner thus prescribed the assessment is complete and the valuation fixed for the purpose of taxation. In its general features the system of taxation in the city of Philadelphia is much the same as in other counties of the commonwealth. It is true that in the city of Philadelphia the courts appoint the members of the board of revision, while in the counties the county commissioners by virtue of their office become a board of revision with certain defined duties as members of such board, but they exercise the same supervisory powers and are clothed with practically the same general authority. In the city the board of revision appoints the local assessors while in other counties they are elected by direct vote by the people, but they exercise the same general powers in making assessments and fixing valuations. It is essential, and the legislature so regarded it, to fix certain periods in which the assessors shall perform their duties, and a certain definite time in which to make their returns. The board of revision cannot act until the returns are so made, and then only in the manner and for the purpose prescribed by law. It sits as a board of review after due public notice to hear and determine the complaints of taxpayers, who may feel aggrieved by the valuations placed upon their properties by the assessors, and for the purpose of revising the assessment in order to equalize as nearly as may be the valuations returned by the

assessors. Any taxpayer who may feel aggrieved by the
action of the board of revision has the right of appeal to
the court of common pleas. This makes a complete
system, but it is apparent that in order to make it prac-
tically effective year by year there must be certain fixed
periods in which the assessors shall perform their duties,
the board of revision do its work and a limited time in
which to take an appeal, else there could be no fixed
definite valuation upon which to make the tax levy. The
legislature recognized this necessity and fixed certain
times or periods for the performance of all these duties.
The Act of May 13, 1856, P. L. 567, provides that the
books for assessment shall be furnished to the assessors
not later than May 15 each year, and by them returned
to the board of revision with the assessments complete
by August 15, following, and failure to comply with this
requirement works a forfeiture of compensation. Sec-
tion 7 of the same act provides that the board of revision
shall commence the discharge of its duties on the first
Monday of September in each year, taking into consid-
eration each assessment, and shall complete the work of
revision within six weeks, and it further provides that
the board shall commence the hearing of appeals on the
third Monday of October and proceed to hear the tax-
payers of the several wards in succession until the same is
closed, not exceeding six weeks. The legislature clearly
had in contemplation that the board of revision should
proceed promptly to revise the assessments and to dis-
pose of appeals when taken, and six weeks for each
branch of this work, twelve weeks in all, were considered
sufficient. It may be that increase in population and
the extension of territorial limits which necessarily in-
volve more work for the board make it difficult to com-
plete the performance of all these duties in the time fixed
by the act of 1856, but there can be no doubt that it was
the intention of the legislature to have the assessments
complete and the valuations of assessed properties defi-
nitely fixed when the duplicates are placed in the hands

of the receiver of taxes for collection. As we are informed by this record the board of revision considers the assessment completed on January 31, following the returns by the assessors in the preceding year. The duplicates should then be in the office of the receiver of taxes, and on February 1 the books are opened for the payment of taxes. The board of revision should have its work completed by that time, and we do not see any escape from the conclusion that when the assessors have completed their assessments and made their returns, and the board of revision during the months following has revised the assessment and disposed of the appeals and caused the duplicates to be prepared and certified to the receiver of taxes, the valuation thus fixed is the one contemplated by the constitution for the purpose of determining the amount of indebtedness that may be incurred. No authority has been called to our attention giving the board of revision equitable supervision over the assessments after the duplicates are in the hands of the receiver of taxes for collection, and we think it is a practice that should not be encouraged, although on the face of the record here presented we do not feel warranted in finally disposing of the question. To say the least, however, the practice rests on doubtful authority and certainly must lead to confusion. It would be much better to have the assessment completed and the valuation finally adjusted when the duplicates are made out and placed in the hands of the receiver of taxes, otherwise there can be no fixed valuation and as a result the exact revenues of the city cannot be counted on with any degree of certainty. We are not familiar with any such practice in other counties of the commonwealth. However this may be, we now hold that the "last preceding assessed valuation" for the year 1910, was the one contained in the duplicates, certified by the board of revision to the receiver of taxes and in his hands for collection on February 1, of the present year. The amount of this assessment as shown by the record is $1,437,927,764.

If anything more need be said in support of this position, it may be found by reference to the provisions of the law and the decisions of the courts relating to assessments and valuations of property for purposes of taxation. The board of revision has no power to make a valuation of property for assessment except when the assessors have omitted to make it: Williamson's Est., 153 Pa. 508. If an owner feels aggrieved by the valuation of his property by the assessor, his proper course is to appeal to the board of revision and this applies to the correction of all errors: Phila. v. Thurlow, 39 W. N. C. 412. The Act of April 1, 1836, P. L. 436, provides that any freeholder of the city of Philadelphia shall have the right of appeal from the assessment fixed by the county commissioners, now the board of revision, if taken within thirty days from the time therein prescribed. After the lapse of thirty days the aggrieved party is without remedy: James v. Bucks County, 13 Pa. 72. Again, under the Act of March 14, 1865, P. L. 320, which gave the right of appeal from the board of revision to the court of common pleas, it was held that the appeal must be taken within the time prescribed by law or it would be too late: City v. Michener, 7 W. N. C. 558. By the Act of March 24, 1909, P. L. 76, it is provided that the books of the receiver of taxes shall be opened and the payment of taxes commence on February 1, each year. This act amended the act of 1895, which was an amendment to the act of 1879, and provided for the change of date for opening books for the collection of taxes. All of these provisions clearly indicate the legislative intention to require all of the preliminary steps in the valuation of property to be taken so that the assessment shall be complete when the duplicates are certified to the receiver of taxes on or before February 1. We can find no authority and none has been called to our attention by the learned counsel in this case, to support the theory that the assessment is not complete until the end of the year for which the taxes are levied. This contention is at

variance with the practice in all other counties of the commonwealth and as it seems to us cannot be sustained without impairing the efficiency of our system of taxation. But it is argued that the assessment for the year 1910 was not in point of fact completed when the duplicates were placed in the hands of the receiver of taxes for collection. While this argument is plausible it is unsound. What the law requires cannot be disregarded because there may have been failure to observe it. It is difficult to see upon what theory the receiver of taxes is authorized to collect definite fixed taxes as shown by the duplicates, if the assessments had not been completed and the valuations of the properties finally determined. The valuation of the property is absolutely necessary as a basis upon which to levy the tax and determine the amount thereof. All of these things are presumed to have been done, and in contemplation of law have been done, when the board of revision certifies the duplicates to the receiver of taxes for collection.

It is contended for the city that personal securities taxed as "money at interest" should be included in the assessed value of the "property therein" in fixing the basis for determining the amount of indebtedness that may be incurred. This raises the question whether this tax is for city or state purposes. It is true that the city or county does receive as a gratuity from the state three-fourths of the tax on personal securities held by residents of the city of Philadelphia and as such subject to taxation. But it is a state and not a city or county tax. The character of the tax is determined by the act which authorizes its imposition, and not by the use made of the revenue thus derived. Personal securities of this character were taxed for state purposes under the act of 1879, which has been amended by the acts of 1889, 1891, and other supplementary legislation. This tax was authorized to be imposed and collected for state purposes. The acts themselves in express language so provide, and there can be no doubt about it. The act of

1891, which in this respect uses the same language as the former acts, provides as to this class of property, that it "is hereby made taxable annually for state purposes at the rate of four mills on each dollar of the value thereof." This fixes the character of the tax and designates the purpose for which it is imposed. It is true the commonwealth, as a matter of public policy, voiced by the legislature, returns a large part of it to the counties. But it is collected by the state, paid into the state treasury and returned to the counties by the officers of the commonwealth as authorized by the statute. Under these circumstances this cannot be treated as a city or county tax, and the personal securities upon which the tax is levied cannot be considered as property taxable for city purposes within the meaning of the constitution.

It is contended for the plaintiff that in addition to the funded indebtedness of the city, there are certain items of unfunded or floating debt which must be treated as an existing indebtedness in determining the borrowing capacity of the city. The principal item claimed as an existing indebtedness under this head arises out of the failure of the city to appropriate for school purposes as much money as it is claimed the act of 1905 requires. It is urged that a legal obligation rests upon the city to appropriate the full amount of money required by that act, and that any deficiency from year to year creates an indebtedness which can be enforced by the board of education when it chooses to do so. Section 9 of this act requires councils of a city of the first class to annually appropriate for school purposes a sum not less than five mills "on each dollar of the total assessment of real property of said school district." The practical difficulty is that councils must act before the assessments are revised and completed and this of necessity requires the appropriation to be made upon estimates furnished by the controller who acts in matters pertaining to schools upon requisitions made by the board of education. The appropriation being thus made upon an estimate fur-

nished by the controller is never in the exact amount which upon a completed valuation may be shown to be required, but it is the nearest approach to it possible with the information at hand when it is made and it is the method recognized by law for the purpose stated. The Act of June 11, 1879, P. L. 130, requires the controller to report to councils not later than September 1, an estimate of the receipts and expenditures for the succeeding calendar year. This statement must of necessity include an estimate of the total assessment for that year, otherwise it would be impossible to determine with any degree of accuracy the amount of taxes to be received at any given rate of taxation. With these estimates before them councils are required not later than October 1, to fix the tax rate for the succeeding year. It is apparent that the tax rate is necessarily fixed upon the estimates furnished by the controller, but these estimates are made under authority of law and do not represent the arbitrary acts of the controller. They furnish the basis of taxation and set in motion the machinery for providing the necessary revenues and making appropriations with which to meet the expenses of the various departments of the city government and school district for the succeeding year. The controller's estimate of the total assessment may be more or it may be less than the amount which the completed valuation may show. If it should turn out to be more the school district would then receive a greater amount than the minimum fixed by the act of 1905; if less, it would not receive the full amount to which it might be entitled. If more were appropriated than the act requires no one would contend that the city might recover the excess amount so appropriated, and if less is appropriated we do not see upon what theory a fixed indebtedness against the city is thus created. It should be borne in mind in this connection that the appropriation is made upon information contained in the budget furnished by the board of education showing its requirements for the succeeding year, and it must be assumed

not only that the necessities of the school district but the total valuation and the amount of revenue to be derived for this purpose are taken into consideration by the school authorities in making up the budget. The expenditures of the school district are estimated on this basis and the schools are maintained out of the appropriation so made. The school system is supported during the year out of the moneys thus set apart and the accounts are annually audited and finally settled. Under these circumstances we can see no virtue in the claim that the school district still has an existing indebtedness against the city for any deficiency which may subsequently appear to exist by reason of not having estimated the total amount of the assessment accurately. The most that can be said of the act of 1905 is that if the estimate of the controller is not as large as the completed assessment may show it ought to be, and the board of education representing the school district deems it advisable to make further requisition to meet the expenses of that year, it may enforce its demand to the amount required to be appropriated by that act. If, however, the board of education accepts the amount appropriated by councils upon the estimate of the controller, maintains the school system out of this appropriation and settles its accounts with the city for the school year upon this basis, it has no further claim for an alleged deficiency. Again, it may be noted that the school authorities make no such demand and do not claim a deficiency or an existing indebtedness of the kind here set up. In this view of the law the contention that these deficiencies for several years create an existing indebtedness against the city cannot be sustained.

The city contends that it is entitled to certain deductions from the gross indebtedness in ascertaining the net indebtedness under the act of 1874. The fifth section of the act provides in substance that the word "indebtedness" shall include all manner of debt, floating as well as funded, and that the net amount thereof "shall be as-

certained by deducting from the gross amount thereof, the moneys in the treasury, all outstanding solvent debts, and all revenues applicable within one year to the payment of the same." This act was passed at the first session of the legislature after the adoption of the new constitution and was intended to give force and effect to the constitutional requirements as to municipal indebtedness. It was in effect a contemporaneous legislative construction of the constitutional provisions relating to this subject. The validity of this act has to all intents and purposes remained unchallenged for thirty-six years. Municipalities have acted upon its authority from the date of its approval to the present time. Indebtedness has been created, loans have been made and bonds issued upon the strength of it during all these years. Nothing but imperative necessity would justify a court, after the lapse of so many years and in view of the fact that a large amount of indebtedness has been created on the faith of it, in now holding that it is in conflict with the constitution. We see no such imperative necessity, but on the other hand it seems to us that the method provided for ascertaining the net indebtedness of municipalities by this act is both reasonable and sensible. This is especially true because both funded and floating indebtedness is included in the gross amount, and it is certainly not unreasonable to deduct from this gross sum those assets of the city available for the liquidation of outstanding obligations. This is what the act contemplates, and no reasonable construction placed upon the constitutional limitations conflicts with the power of the legislature to so provide. Of course, the municipal authorities cannot arbitrarily say that every claim of the city is an outstanding solvent debt, or that revenues necessary to pay current expenses could be set apart for this purpose, but where there are bona fide outstanding debts due the city, and revenues not necessary to meet current expenses are available for the payment of indebtedness within the year, such deductions can be made

under the provisions of the act in ascertaining the net indebtedness. The facts presented by this record are too meager to warrant a finding as to each item claimed as a deduction by the city, and for the purposes of this case we do not deem it necessary to discuss in detail the items of deduction claimed. Under the general principle stated the city is clearly entitled to a deduction for several of the items claimed, and it may be that upon a full presentation of all the facts some of the items would not be allowed, but without regard to what items would be allowed and what items might not be, the borrowing capacity of the city has not been exhausted and the loan in question is clearly within the limit.

The contentions that the city is without authority to make the loan for the purposes stated, and that the purposes set out in the ordinance are not sufficiently specific, we think cannot be sustained. As to loans for temporary or other purposes the statutes do not provide for a definite statement of purpose as is required to give notice to the public by the act authorizing a loan only upon direct vote of the people. The practice always has been, however, as it ought to be, to set out in the ordinance the purpose or purposes for which the indebtedness is to be incurred, even when the loan is for temporary purposes, and this was done in the present case. The moneys cannot be used for any purpose other than stated in each item contained in the ordinance, and if the municipal authorities should attempt to divert the moneys thus provided to any other purpose they would be enjoined from so doing. If, however, the moneys to the amount specified in each item of the ordinance are used for the specific purpose stated, nothing contained in any of the statutes relating to this. character of loan denies the right of the municipality through its proper authorities to so provide. There is no suggestion in the record that any attempt will be made to divert the proceeds of the loan to any purpose other than that provided in the ordinance, and if any such attempt should be made the municipal authorities would

subject themselves to the penalties provided for so doing and could be enjoined by any taxpayer or other party in interest.

Many other questions have been raised, but we deem it unnecessary to discuss them in detail for the purposes of this case. Enough has been said to demonstrate that the city has not reached the limit of its borrowing capacity under the constitution. We therefore hold that the loan in question in the present case is within the borrowing capacity of the city and that the municipal officers under the facts presented by this record cannot be enjoined from proceeding to negotiate it as authorized by the ordinance.

Bill dismissed at cost of plaintiff.